## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **NuNET, INC.** | : | |
| **d/b/a/ NuNet FIBER TECHNOLOGIES** | : | **Bky. No. 05-21633ELF** |
| | : | |
| **Debtor** | : | |
| | : | |

# OPINION

**BY:  ERIC L. FRANK,   U.S.  BANKRUPTCY JUDGE**

# I.   INTRODUCTION

Before the court are the objections filed by NuNet, Inc. (the "Debtor" or "NuNet") to five proofs of claim filed by Rudolph Geist, Edward Geist, Edward J. Geist, Jr., Stacey Geist and Josephine Geist (the "Geist Claimants").  All five claims relate back to a purchase agreement signed in March 1999, whereby NuNet purchased all of the existing shares of U.S. Netway, Inc. ("U.S. Netway") in exchange for, inter alia, the assumption of certain liabilities of U.S. Netway.

# II.   PROCEDURAL HISTORY

On March 24, 2005, the Debtor commenced its bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The case was assigned to Judge Thomas M. Twardowski in this court's Reading division.  On July 15, 2005, the Geist Claimants filed the following ten (10) separate proofs of claim (the "Claims") against the Debtor:

> (a)    Claim Nos. 46 and 59 filed by Rudolph J. Geist;

(b)     Claims Nos. 47 and 58 filed by Edward J. Geist, Jr.;

(c)     Claim Nos. 48 and 57 filed by Edward J. Geist, Sr.;

(d)     Claim Nos. 49 and 55 filed by Stacey Geist; and

(e)     Claim Nos. 50 and 54 filed by Josephine Geist.

Although the docket entries reflect that each of the Geist Claimants filed two separate proofs of claim, each Claimant intended to file only one proof of claim. Consequently, five of these proofs of claim are actually duplicative due to a clerical error.[1]

On September 14, 2005, the Debtor filed its Amended Plan of Reorganization. On October 18, 2005, the Debtor filed objections to the Claims. A hearing was held on November 17, 2005. Neither the Geist Claimants nor their attorney attended the hearing. An Order was entered sustaining the objections and awarding the Geist Claimants a collective general unsecured claim in the amount of $100,000. By Order dated December 1, 2005, the Court confirmed the Debtor's Amended Plan of Reorganization.

On December 5, 2005, the Geist Claimants filed a Motion to Reconsider the November 17, 2005 Order. The Debtor filed a response on December 21, 2005. A hearing was held on the Motion to Reconsider on December 22, 2005. On January 27, 2006, the court entered an order granting the Geist Claimants's Motion to Reconsider, which stated that a hearing would be held "on the merits of the Debtor's Objections to the various Geist Claims." Subsequently, on February 3, 2006, Judge Twardowski retired. Judge Richard E. Fehling replaced Judge

---

[1] The Geist Claimants filed individual claims against the Debtor because they were each individual guarantors of one of the underlying debts in the Claims. The Geist Claimants encountered difficulty when attaching all of the exhibits to support the Claims originally filed on July 15, 2006. In an abundance of caution, the Geist Claimants re-filed each proof of claim that same day.

Twardowski after being sworn as a United States Bankruptcy Judge on February 14, 2006.  Judge

Fehling recused himself from the Debtor's chapter 11 case on February 21, 2006. Consequently,

the chapter 11 case was reassigned to me.

On March 15, 2006, I held a hearing on the claims objection pursuant to the January 27,

2006 order.[2]  During the hearing, the parties agreed that the ultimate disposition should result in a

single amount to be allowed collectively for all five Geist Claimants and that neither the Debtor,

nor the court, need consider how that figure will be divided up among the Geist Claimants.  At

the close of the hearing, I requested the parties to submit proposed findings of fact and

conclusions of law.

## III.    FINDINGS OF FACT

### A.    The Agreement of Sale

1.    In or around January 1999, Rudolph Geist contacted John Keown, Chief

Executive Officer of NuNet, about purchasing U.S. Netway.  (N.T. at 15).

2.    U.S. Netway was motivated to close a prompt purchase transaction because it was

in serious financial distress in or around January 1999.  (N.T. at 16).

3.    In a letter dated January 28, 1999 (the "January 1999 Letter of Intent"), NuNet,

and U.S. Netway outlined the basic terms and conditions pursuant to which NuNet would

purchase 100% of the issued and outstanding stock of U.S. Netway.  (Exhibit D-9).

―――――――――――――――――

[2] The court has jurisdiction over the Debtor's objections pursuant to 28 U.S.C. § 1334.
This matter is a core proceeding pursuant to 28 U.S.C.  §§ 157(b)(2)(A) and (B).

3

4.    Among several conditions, the January 1999 Letter of Intent specifically stated that NuNet would:

(a)    pay in full any outstanding balance of the U.S. Netway Small Business Administration Loan (the "SBA Loan") through PNC Bank; and

(b)    engage in a successful negotiation with the IRS to create an installment agreement to pay the outstanding federal taxes of U.S. Netway, which were estimated to be approximately $65,000 plus interest and penalties.

(Exhibit D-9 at 2).

5.    The January 1999 Letter of Intent was signed by John Keown for NuNet and by Edward J. Geist, Jr. and Rudolph Geist for U.S. Netway. (Exhibit D-9 at 4).

6.    Mr. Keown relied on the January 1999 Letter of Intent in determining how much NuNet was willing to pay for the stock of U.S. Netway.  (N.T. at 27).

7.    There were approximately five and one-half weeks of negotiation during which time there were approximately three revisions made to a document called an "Agreement of Sale" (the "Agreement").  (N.T. at 121).

8.    Rudolph Geist was the primary negotiator and Edward J. Geist, Jr. was a secondary negotiator for U.S. Netway.  (N.T. at 94, 112).

9.    Edward J. Geist, Jr. assisted in drafting the Agreement. (N.T. at 94).

10.    On March 8, 1999, Mr. Keown received a fax copy of the Agreement, which contained the March 8, 1999 Balance Sheet of U.S. Netway as part of Exhibit B. (the "Balance Sheet") (N.T. at 28).  A prior draft of the Agreement did not contain a balance sheet of U.S. Netway. (Exhibit D-2).

4

11.    Mr. Keown never saw the Balance Sheet prior to March 8, 1999.  (N.T. at 31).

12.    The Balance Sheet listed three loans from Rudolph Geist (the "Rudolph Geist Loans) as "Long Term Liabilities" of U.S. Netway. (Exhibit D-1).

13.    On March 8, 1999, Mr. Keown and Rudolph Geist had a phone discussion wherein Mr. Keown pointed out that the Rudolph Geist Loans were not intended to be part of the agreement of NuNet to assume the liabilities of U.S. Netway.  During this phone discussion, Mr. Keown advised Rudolph Geist that he would strike out the Rudolph Geist Loans on the Balance Sheet. (N.T. at 30-31, 54-55).

14.    On March 8, 1999, the Agreement was executed.  The Agreement was signed by Edward J. Geist Jr., President, CEO, Vice Chairman, Treasurer, for U.S. Netway, by John Keown for NuNet, and by a witness, Susan Payne, U.S. Notary. (Exhibit D-1; N.T. at 14).

15.    The signatories faxed their signed copies of the Agreement to one another because they were not all in the same place when it was executed. (N.T. at 53, 76)

16.    A prior draft of the Agreement included signature lines for the shareholders of U.S. Netway. (Exhibit D-2; N.T. at 15).

17.    On or about March 20, 1999, Mr. Keown and Edward J. Geist, Jr. met to exchange duplicates of the Agreement that they executed on March 8, 1999.  (N.T. at 53).

18.    As set forth in Paragraph 3 of the Agreement, the consideration paid by NuNet to acquire the 200,000 authorized and issued shares of capital stock of U.S. Netway consisted of three (3) components:

(a)    NuNet's assumption of the "outstanding debts and liabilities . . . of the Corporation and the SELLERS at the time of closing . . . ;"

5

(b)      Issuing 200,000 shares of Class B common stock of NuNet to the

respective shareholders of U.S. Netway on a one for one basis; and

(c)      Automatic conversion of the Class B common stock into NuNets' Class A

common stock two (2) years after the execution of the Agreement.

19.      The Agreement also contains two (2) indemnification provisions:

Paragraph 7(f) provides in pertinent part:

> PURCHASER specifically agrees to indemnify and hold harmless [the Geist Claimants] from and against any and all liability, claims, loss, judgments, damage or expense, including all related attorneys fees incurred or required to be paid by [the Geist Claimants], by reason of any breach or failure of observance or performance with respect to the obligations of PURCHASER as set forth **in this paragraph**.

(emphasis added).

Paragraph 10 provides:

> **Indemnification**.  Each party hereto shall indemnify and hold the other parties harmless and against all liability, claim, loss, damage or expense, including reasonable attorneys fees, incurred or required to be paid by such other parties by reason of any breach or failure of observance or performance of **any representation, warranty or covenant or other provision of this Agreement by such party**.

(Exhibit D-1 at ¶¶ 7(f) and 10) (emphasis added) .

20.      The Agreement provides that Pennsylvania law is the governing law of the

Agreement.  (Exhibit D-1 at ¶18).

21.      Exhibit B to the Agreement consists of two parts, (a) a list of U.S. Netway's

"Existing Indebtedness," which includes the accounts payable of U.S. Netway and;  (b) the

Balance Sheet of U.S. Netway as of March 8, 1999.  (Exhibit D-1; N.T. at 110).

6

B.    **The Bankruptcy Case and the Claims' Objection**

22.    On March 24, 2005, NuNet commenced its bankruptcy case by filing a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.

23.    On September 14, 2005, the Debtor filed its Amended Plan of Reorganization

dated September 14, 2005.

24.    On or about July 15, 2005, the Geist Claimants filed ten proofs of claim; five of

which are duplicative.[3]

25.    The parties stipulated that the <u>collective</u> amount of the Geist Claimants' proofs

of claim against the Debtor is $304,325.12 (the "Collective Proof of Claim") (N.T. at 9-11).  The

Collective Proof of Claim is broken into the following four (4) components:[4]

| | | |
|---|---|---|
| • | Amount paid to D&L in settlement of confession of judgement proceedings | $100,000.00 |
| • | Payment of Federal Tax liabilities by Edward J. Geist, Jr. | $ 27,000.00 |
| • | Outstanding principal and interest owed, as of 3/1/06, on loans by Rudolph J. Geist | $ 81,455.98 |
| • | Attorneys' fees incurred in pursuit of legal claims against NuNet and in defense of D&L judgment proceedings | $ 95,869.14 |

[3] <u>See</u> <u>supra</u>, n. 1.

[4] The parties stipulated that the Collective Proof of Claim consists of only four (4)
components because the Geist Claimants waived any possible claim for monetary damages
resulting from NuNet's failure to convert the stock. (N.T. at 35-37).  The parties also stipulated
that the Collective Proof of Claim is approximately $304,000, which differs from the total value
of the original proofs of claim filed on July 15, 2005 . (N.T. at 10).  In light of this, I find that the
proofs of claims filed on July 15, 2005 were amended at the March 15, 2006 hearing. As set forth
above,  I adopted the break down of the Collective Proof of Claim the Geist Claimants presented
in their Proposed Findings of Fact.  (<u>See</u> Geist Claimant's Proposed Findings of Fact at 2).

7

TOTAL                                    $304,325.12

### The D&L Action Component of the Collective Proof of Claim

26.     As of the filing of the Debtor's bankruptcy petition, the Debtor had not satisfied the SBA Loan nor replaced the Geist Claimants as personal guarantors thereon pursuant to Paragraph 7(f) of the Agreement.  (N.T. 89-90).

27.      D&L Realty, the Assignee under the SBA Loan, confessed judgement against each of the Geist Claimants in the Court of Common Pleas, Luzerne County, Pennsylvania (No. 2542-C-2003) (the "D&L Action"). (Exhibit C-11; N.T at 85-87).

28.     The Geist Claimants settled the D&L Action for payment of $100,000 and are entitled to recover said $100,000 as part of the Collective Proof of Claim.  (N.T. at 9).

### The Tax Liability Component of the Collective Proof of Claim

29.     Prior to executing the Agreement, NuNet engaged in discussion with the IRS to cure the federal payroll tax liability of U.S. Netway. (N.T. at 23).

30.     The IRS advised NuNet that the approximate liability for the unpaid federal payroll taxes was $47,000, excluding interest and penalties. (N.T. at 23).

31.     After the Agreement was consummated, the IRS recorded a lien against the Debtor, which was transferred over from U.S. Netway, based on the unpaid taxes of U.S. Netway.  At the time the lien was recorded, the specific amount recorded was a figure above $47,000.  (N.T. at 52).

32.     The IRS and NuNet reached a $47,000 settlement for U.S. Netway's unpaid federal payroll  taxes. The IRS waived the interest and penalties.  (N.T. at 48).

33.     The IRS placed a lien on Edward J. Geist Jr.'s family home for U.S. Netway's outstanding federal payroll tax liability.  (N.T. at 81).                  .

34.     Edward J. Geist Jr.'s wages from Network Integration Services have been garnished by the IRS as a result of unpaid federal payroll tax liability.  (N.T. 82-83).

35.     Edward J. Geist, Jr.  has paid approximately $7,000 toward the outstanding federal payroll tax liability of U.S. Netway.  (N.T. at 84).

36.     There is currently approximately $20,000 still owed to the IRS by Edward J. Geist, Jr. for the outstanding federal payroll tax liability of U.S Netway.   (N.T. at 84).


<u>The Attorneys Fees Component of the Collective Proof of Claim</u>

37.     The Geist Claimants assert in the Collective Proof of Claim that they are owed, collectively, the sum of $95,869.14 in connection to attorneys fees.[5]

38.     The Debtor agrees that the Geist Claimants are entitled to their attorneys fees in connection with the D&L Action pursuant Section 7(f) of the Agreement.  (N.T. at 38).

39.     The Debtor suggests that the Geist Claimants are entitled to $30,000 in attorneys' fees for their defense of the D&L action. (N.T. at 8-11; 37-41, 58-60).

---

[5] Although the original proof of claim filed on July 15, 2005 asserted $85,395.42 in attorneys fees, (<u>see</u> Exhibit C-15), Edward J. Geist, Jr. stated that the amount of attorneys fees owed is $95,869.14. (N.T. at 91). The Debtor raised this discrepancy in its Proposed Findings of Fact. (<u>See</u> Debtor's Proposed Findings of Fact at 6, n.1). However, the Debtor stipulated at the hearing that the total amount of the Collective Proof of Claim was roughly $304,000, which included the larger figure for attorneys fees. <u>See</u> <u>supra</u>. n. 4.

40.     The Geist Claimants filed two (2) lawsuits against NuNet in the Court of

Common Pleas, Luzerne County, Pennsylvania (Nos. 2066-CIV-2002 and 98-E-2000), one in

law and the other in equity, to remedy NuNet's alleged breach of the Agreement (the "Luzerne

County Litigation"). (Exhibits C-13 & C-14 ).

41.     When the Geist Claimants initiated the Luzerne County Litigation, the SBA Loan

and the federal payroll tax liability had not been satisfied.  The NuNet stock also had not been

converted to the Class A series. (N.T. at 89-90).

42.      The purpose of the Luzerne County Litigation was to collect damages resulting

from NuNet's alleged breach of the Agreement.  (N.T. at 92).

43.     The Geist Claimants paid the attorneys fees they incurred in connection with the

D&L Action and the Luzerne County Litigation. (Exhibit C-15; N.T. at 91).


### The Rudolph Geist Loans Component of the Collective Proof of Claim

44.     On July 18, 1998, a Loan Agreement was executed between Rudolph Geist and

U.S. Netway, through U.S. Netway's representative, Edward J. Geist, Jr. (the "Rudolph Geist

Loan Agreement").  (Exhibit C-9).

45.     Pursuant to the Rudolph Geist Loan Agreement, Rudolph Geist made three (3)

separate loans to U.S. Netway totaling $47,701.14.  (Exhibit C-9).

46.     In a Promissory Note dated July 18, 1998, U.S. Netway promised to repay

the Rudolph Geist Loans in thirty-six (36) equal installments beginning on August 3, 1998.

(Exhibit C-9 at 2).

47.     The Rudolph Geist Loans were not listed on the first page of Exhibit B of the

Agreement where the "Existing Indebtedness" and current accounts payable of U.S. Netway were provided to NuNet.

48.    Mr. Keown knew that Rudolph Geist gave U.S. Netway money prior to his receipt of the Balance Sheet on March 8, 1999, but was not aware of any formal loan agreement. (N.T. at 26).

49.    Mr. Keown did not see or review the Rudolph Geist Loan Agreement or Promissory Note until some time in or around April 5, 1999, approximately one (1) month after the Agreement was executed. (N.T. 27, 61-62).

50.    Mr. Keown believed during negotiations and upon the execution of the Agreement, that the Rudolph Geist Loans were not to be paid by NuNet pursuant to the Agreement.  (N.T. at 26, 56).

51.    Mr. Keown also believed that Rudolph Geist consented to striking out the Rudolph Geist Loans on the Balance Sheet of the Agreement on March 8, 1999. (N.T. at 55-56).


# IV.  <u>DISCUSSION</u>

## A.    <u>Applicable Legal Principles</u>

Proofs of claim are deemed allowed unless a party in interest objects.  11 U.S.C. § 501.  If an objection is filed to a proof of claim, the burden of proof shifts between the parties.  <u>United States v. Baskin and Sears P.C.</u>, 207 B.R. 84, 86 (E.D. Pa.1997).

> [A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. In practice, the objector

11

must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In Re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir.1992) (citations omitted).  As to the final burden of proof, the claimants have the final burden to prove the claim by a "preponderance of the evidence."  In re Gimelson, 2004 WL 2713059, at* 13 (E.D. Pa. 2004) (citing In re Galloway, 220 B.R. 236, 244 (Bankr. E.D. Pa. 1998).

The Debtor asserts that it has shifted the burden of production back to the Geist Claimants and that the Geist Claimants are unable to prove by a preponderance of the evidence that they are entitled to any collective, general unsecured claim in excess of $130,000.00.[6]  The three components of the Collective Proof of Claim at issue are: (1) the federal payroll tax liability; (2) the attorneys fees; and (3) the Rudolph Geist Loans.  To resolve these disputes, I must turn to fundamental state law contract principles because Pennsylvania is the governing law of the Agreement.

In the Commonwealth of Pennsylvania, a contract is created when there is mutual assent to the contract's terms by the parties with the capacity to contract. Shovel Transfer and Storage, Inc. v. Pa. Liquor Control Bd., 559 Pa. 56, 63, 739 A.2d 133, 136 (1999) (citing Taylor v. Stanley Co. of Am., 305 Pa. 546, 158 A. 157 (1932)).  The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. Hart v. Arnold, 2005 Pa. Super 328, 884

_____

[6] The parties stipulated that the Geist Claimants are entitled to $100,000 for the settlement of the D&L Action.  The Debtor also agrees that the Geist Claimants are entitled to $30,000 in attorneys fees for their defense of the D&L Action.

A.2d 316, 332 (2005). In determining the intent of the parties, the court must examine the entire

contract because the intent of the parties is to be regarded as being embodied in the writing itself.

Murphy v. Duquesne University Of The Holy Ghost, 565 Pa. 571, 591, 777 A.2d 418, 429 (2001)

("Courts do not assume that a contract's language was chosen carelessly, nor do they assume that

the parties were ignorant of the meaning of the language they employed.").  It also is  proper to

consider the purpose of the agreement and the surrounding circumstances of the transaction.

Lower Frederick Township v. Clemmer, 518 Pa. 313, 329, 543 A.2d 502, 510 (1988)

　　　　In my examination of the Agreement, I am mindful of the circumstances surrounding its

creation.  Based on the testimony I received, it is clear that U.S. Netway was sinking rapidly and

needed assistance in or around January 1999.  NuNet was intended to be U.S. Netway's savior by

getting it out of its financial crisis.  The purpose of the Agreement was to memorialize a deal by

which NuNet would purchase all the existing shares of U.S. Netway in exchange for issuing the

U.S. Netway shareholders Class B stock on a one for one basis and assume certain debts and

liabilities of U.S. Netway.  While the negotiation took place over the course of approximately

five weeks between Mr. Keown and Mr. Rudolph Geist, the Agreement appears to have been

executed in a rather rapid fashion with at most, three drafts and, perhaps multiple executed

copies transmitted via facsimile, and later exchanged in person.

　　　　With this background in mind, I must ascertain the parties' intentions as to the scope of

the liabilities assumed by the Debtor insofar as they form the basis of the proofs of claim in issue.

**B.    Federal Payroll Tax Liability**

The first component of the Collective Proof of Claim arises from the Geist Claimants'

contention that the Debtor did not fulfill its obligation under the Agreement to assume the

outstanding federal payroll tax liability of U.S. Netway.  The Geist Claimants argue the Debtor

breached the Agreement and, as a result, Edward J. Geist, Jr., as President of U.S. Netway,

suffered damages.  Specifically, the IRS garnished Edward J. Geist, Jr.'s wages and imposed a

lien on his personal residence.  In the Collective Proof of Claim, the Geist Claimants requested

$24,730.46 in damages.  During the March 15, 2006 hearing, Mr. Geist testified that there are

approximately $27,000 in damages: he paid $7,000 to the IRS and there remains approximately

$20,000 in tax liability remaining.

The Debtor objects on the basis that it has already complied with its obligations under the

terms of the Agreement.  I agree.

According to the Agreement, NuNet represented and warranted that it was required to

make "arrangements with the Internal Revenue Service to pay and . . . satisfy all past due Federal

Payroll taxes of the **Corporation**." (Exhibit D-1 at ¶ 7(I)) (emphasis added).  NuNet also agreed

upon as a condition to closing the deal with U.S. Netway that it will have engaged in discussions

with the IRS  "regarding the **Corporation's** past due Federal Payroll taxes and any related

penalties and interest (the "Taxes") and is satisfied that the IRS will provide PURCHASER with

an arrangement whereby PURCHASER will be permitted to repay the Taxes pursuant to an

installment repayment arrangement."  (Exhibit D-1 at ¶ 9(d)) (emphasis added).

The Debtor met with the IRS and was advised by the IRS that the approximate liability in

taxes to discharge the lien amounted to $47,000, excluding interest and penalties.  At the hearing,

the Debtor produced exhibits of the $47,000 check it tendered to the IRS, as well as the

conditional commitment letter from the IRS discharging the federal tax lien subject to payment

of said sum.

The Geist Claimants contend that NuNet breached the Agreement, despite its payment of

$47,000, because the entire liability to the IRS was not paid.  I do not find merit in this argument.

My reading of the plain language of the Agreement is that the Debtor's obligation was to resolve

the tax liability of U.S. Netway.  The Debtor did precisely that.  As I read the provision, the

Debtor's duty ran to U.S. Netway as an entity, not to other parties who may have been exposed to

liability for the unpaid tax obligation.  The Geist Claimants would have me read this provision to

mean that the parties intended that the Debtor's obligation to resolve the tax liability required full

payment of the tax liability.  I find no such duty imposed on the Debtor in the language of the

Agreement and I believe that if the Debtor had undertaken such a duty it would have been

expressly stated in the text of the Agreement.  By comparison, Paragraph 7(f) expressly names

the Geist Claimants as entitled to indemnification for, inter alia, liability and damages by reason

of NuNet's failure to perform its obligation to pay the SBA Loan in full.

Furthermore, it appears that the parties contemplated the possibility that the tax liability

might be compromised.  The January 1999 Letter of Intent states that "[t]he negotiated

installment agreement will result in the **abatement of penalties** by the IRS." (Exhibit D-9 at 2)

(emphasis added).[7]   Therefore, the Debtor did not breach the Agreement.  The objection to this

---

[7] I admitted the January 1999 Letter of Intent, as well as other parol evidence, because the
Agreement lacked an integration clause.  See Yocca  v. Pittsburgh Steelers Sports, Inc., 578 Pa.
479, 498, 854 A.2d 425, 436 (2004) ("An integration clause which states that writing is meant to
represent the parties' entire agreement is also a clear sign that the writing is meant to be just that
and thereby expresses all of the parties' negotiations, conversations, and agreements made prior

component of the Collective Proof of Claim is sustained.

### C.  **Attorneys Fees**

In the second component of this Collective Proof of Claim, the Geist Claimants assert that they are entitled to the sum of $95,869.14 in attorneys fees pursuant to two different indemnification provisions of the Agreement.  The attorneys fees arose from three lawsuits, but can be separated into two (2) components for this analysis.  The first component relates to the attorneys fees the Geist Claimants incurred in their defense of the D&L Action.  The second component pertains to fees incurred in the Luzerne County Litigation.

As to the first component of this proof of claim, there is no objection.  The Geist Claimants cite to Paragraph 7(f) of the Agreement for the attorneys fees they incurred in the D&L Action.  The Debtor agrees that the Geist Claimants are entitled to $30,000 in attorneys fees pursuant to Paragraph 7(f) for their defense.[8]   The Geist Claimants did not dispute this figure.

The second component of the objection to this proof of claim is more complicated.  I must determine whether the Geist Claimants are entitled to indemnification for the balance of their attorneys fees listed in the Collective Proof of Claim. The resolution of this issue hinges on whether the shareholders may be indemnified as "parties" under Paragraph 10 of the Agreement. The Debtor contends the shareholders are not parties because their signature lines were removed

---

to its execution.");  Green Valley Dry Cleaners, Inc. v. Westmoreland County Indus. Development Corp., 832 A.2d 1143, 1155 (Pa. Cmmw. 2003) (stating that the absence of an integration clause serves as persuasive evidence that the parties did not intend the agreement to "serve as a complete and exclusive statement of the terms of their transaction.").

[8] Mr. Keown testified that he reviewed the attorneys fees and his "best estimate" was approximately $30,000 worth of attorneys fees can be attributed to the D&L Action.

from the final draft of the Agreement and because only the two corporations signed the

Agreement.  However, while the lack of signatures, as well as the omission of the signature lines

may be significant, such evidence is not dispositive.

As a general rule, signatures to a contract are not required unless such signing is expressly

required by law or by the intent of the parties. Shovel, 559 Pa. at 63.  A written contract which

has not been signed by one of the parties will nevertheless create a valid, binding agreement if

both parties manifest their assent to its terms, Daniel Adams Associates, Inc. v. Polony, 360 Pa.

Super. 72, 87, 519 A.2d 997, 1004-1005 (1987) (citations omitted), and the essential terms of the

contract are settled.  Novembrino v. International Ass'n of Machinists and Aerospace Workers

Lodge2462, 144, Pa. Cmmw. 458, 465, 601 A.2d 916, 920 (1992).  There is a presumption that

the parties intend their contract to be operative absent a signed writing unless one of them

indicates to the contrary. Ingrassia Construction Co. V. Walsh, 337 Pa. Super. 58, 68, 486 A.2d

478, 483 (1984) (citing 1 S. Williston, Williston on Contracts, § 28 (1957)).  Indeed, the mere

presence of signature lines does not determine whether the parties intended to be bound only

upon the execution of the document by all signatories; instead, the inquiry is directed to whether

the parties agreed to the terms in question and intended to be bound by the terms of the contract.

Shovel, 559 Pa. at 65.

In construing the Agreement, I conclude that it was intended that the shareholders be

parties.  I reach this conclusion after considering several provisions in the body of the

Agreement.

First, the preamble establishes that the Agreement is between the "Sellers" and the

"Purchaser."  The term "Sellers" is a plural term, defined as the Corporation (U.S. Netway) and

"the existing shareholders of the Corporation who are listed in Exhibit 'A.'" I read "Sellers" to be a collective, inclusive term that includes both the subgroup of the Corporation and the subgroup of the shareholders.

Next, the Agreement provides in multiple places that the "Sellers" had specific obligations to the Purchaser.  For instance, in Paragraph 1, the Sellers, which included each shareholder, had to "agree to sell, transfer and deliver to [NuNet] . . . the two hundred shares of the capital stock of U.S. Netway, Inc. . . ."  The shareholders listed in Exhibit A are referenced with respect to this obligation.   Likewise, in Paragraph 6, it is the Sellers, not the Corporation, that made representations and warranties to the Purchaser.  Furthermore, there are other places where the Agreement speaks about a specific responsibility or action of one of the subgroups and uses that designated term, rather than Sellers (or even the singular term Seller). (See Exhibit D-1 ¶¶ 4 and 6)

Finally,  I find it compelling that the Agreement did not require each shareholder to sign the Agreement for its validity and consummation of the transaction. Compare Franklin Interiors v. Wall of Fame Management Co., 510 Pa. 597,  511 A.2d 761 (1986) (finding unsigned document invalid due to express warranty requiring signatures for the formation of a valid contract) with Shovel, 559 Pa. 56, 739 A.2d 133 (finding intent of the parties controlled where there was no written term of the contract that required the signatures for the formation of a valid contract).  Rather, NuNet was entitled to be released from its obligation under the Agreement if each shareholder did not sign by April 9, 1999.[9]  It is significant that NuNet did not exercise this

_____

[9] Paragraph 4 of the Agreement entitled "The Closing" provides in relevant part:

> To allow for a reasonable time for the Corporation to obtain authorization

option or concern itself with the fact that each seller did not produce a duly endorsed signature

page of the Agreement at the time of the Closing as contemplated in Paragraph 5 of the

Agreement.[10]  Instead,  NuNet appears to have overlooked such formalities and proceeded with

the transaction.  As a result, NuNet received the 200,000 shares from each shareholder as

intended.  In practice, the shareholders acted and performed their mutual obligations under the

Agreement just as if they had signed the Agreement.  While I cannot fully deduce the logic

behind the omission of the signature line for each shareholder or the absence of an endorsed

signature page from each Seller at the closing, in looking at the Agreement as a whole, I conclude

that the Debtor's argument exalts "form over substance" and that the individual shareholders

were intended to be parties to the Agreement.

Having found the shareholders were parties to the Agreement, I turn to the specific

---

of **all** SELLERS required to execute this Agreement, PURCHASER shall be bound by the terms and conditions of this Agreement upon execution of the Agreement by authorized representatives of PURCHASER and the Corporation, and shall remain bound to the terms and conditions of the Agreement until April 9, 1999, at which time the PURCHASER, at the PURCHASER's option, shall be released from its obligations under this Agreement **in the event the Corporation has failed to obtain the separate execution of this Agreement by each SELLER**. Upon execution of this Agreement by **all** SELLERS and the delivery by the Corporation's authorized representative, Edward Geist, Jr. to PURCHASER of the Closing documents on or before April 9, 1999 the Agreement will automatically become final and fully binding on PURCHASER and the SELLERS, and the immediately preceding sentence shall be superseded.  SELLERS agree to deliver all necessary closing documents to PURCHASER on or before April 9, 1999.

(D-1 at ¶ 4).

[10] Paragraph 5(b) provides that the Sellers would provide at the closing through their authorized representative, Edward J. Geist, Jr., "a duly endorsed signature page of this Agreement by each SELLER which shall become attached hereto."( D-1 at ¶ 5).

provision in issue.  Paragraph 10 provides:

> Each party hereto shall indemnify and hold the other parties harmless from and against all liability . . . including reasonable attorneys fees, incurred or required to be paid by such other parties by reason of any breach or failure of observance or performance of any of any representation, warranty or covenant or other provision of this Agreement by such party.

Edward J. Geist, Jr. testified that the purpose for initiating the Luzerne County Litigation was to collect the damages that he and the other Geist Claimants suffered as a result of NuNet's alleged breach of the Agreement.  When the Geist Claimants filed the lawsuits, the SBA Loan and the IRS liability were not satisfied.  The NuNet stock also had not been converted to the Class A series.   The Geist Claimants paid their attorneys fees for the Luzerne County Litigation, as well as the fees for the D&L Action.  While these attorneys fees appear high, the Debtor did not present any evidence to call into question the "reasonableness" of these  attorneys fees.[11]   In the absence of specific objections to the reasonableness of the fees incurred, I will not penalize the Geist Claimants for an aggressive pursuit of their entitlements under the Agreement.  If counsel for the Geist Claimants was overzealous in its representation (and in its billing), it was incumbent upon the Debtor to develop the facts at trial to focus this defense.  It did not do so.

The Geist Claimants are entitled to the entire amount of attorneys fees they listed in their proof of claim, $95,869.14, of which $65,869.14 is attributed to the attorneys fees incurred in the Luzerne County Litigation.  Therefore, the Debtor's objection to the attorneys fees component of the Collective Proof of Claim is overruled.

---

[11] The Debtor grounded its objection to the claim for attorneys fees pursuant to Paragraph 10 of the Agreement solely in its argument that the Geist Claimants were not parties to the Agreement.

### D.   The Rudolph Geist Loans

The final component to the Collective Proof of Claim pertains to the Rudolph Geist Loans.  The Geist Claimants assert that as of March 1, 2006, Rudolph Geist is owed $81,455.98 for the outstanding principal and interest due from three loans he made to U.S. Netway.[12]  The basis for this component is the Geist Claimants' contention that the Rudolph Geist Loans were among the liabilities of U.S. Netway that NuNet assumed as part of the Agreement.  Specifically, the Geist Claimants point to Page 4 of Balance Sheet, which lists each loan from Rudolph Geist as a Long Term Liability of U.S. Netway.

The dispute centers on whether the parties intended the Rudolph Geist Loans to made part of the Agreement as incorporated by the Balance Sheet included in Exhibit B.  Based on all the evidence  received, I find that the Rudolph Geist Loans were not intended to be part of the Agreement.

As a preliminary matter, I do not doubt that Rudolph Geist gave U.S. Netway money in 1998 as an effort to salvage the company.  I reviewed the Rudolph Loan Agreement and the Promissory Note.  The documents indicate that U.S. Netway promised to repay the loan in thirty-six (36) equal installments beginning on August 9, 1998.

However, the transaction lacked formality.  David H. Koral, a former U.S. Netway shareholder/director and current NuNet shareholder, testified that there was no formal board action to authorize the Rudolph Geist Loans and that the shareholders were notified of it after the fact.  There was no corporate resolution and Mr. Koral believed Rudolph Geist was to receive

---

[12] In their proof of claim, the Geist Claimants list the Rudolph Geist Loans to be $75,312.88.

21

stock instead of money as repayment for his loans to U.S. Netway.  Further, contrary to the terms

of the Promissory Note, the Rudolph Geist Loans were not in active repayment status at the time

of the Agreement's execution.  They were not listed as an Existing Indebtedness on page 1 of

Exhibit B to the Agreement.  Edward J. Geist, Jr.'s rationale for this omission was that the

Rudolph Geist Loans were done as a favor and that Rudolph Geist was not pushing to have

payments made on the loan.  Such informality and imprecision suggests that repayment of the

Rudolph Geist Loans was not presented as a material term of the transaction during the parties'

negotiations.

It appears to me that the Rudolph Geist Loans were, perhaps, an after-thought and added

to the Agreement at the eleventh hour. Though Mr. Keown knew that Rudolph Geist gave U.S.

Netway money, he testified that they were not expressly mentioned in the Agreement until March

8 1999, the day of its execution and when the Balance Sheet appeared for the first time.  I believe

Mr. Keown's testimony.

I also find that there was an agreement to strike out the Rudolph Geist Loans on the

Balance Sheet on March 8, 1999.  Mr. Keown testified that upon discovering the presence of the

Rudolph Geist Loans on the Balance Sheet, he advised Rudolph Geist over the phone that he was

striking them out.  Mr. Keown believed Rudolph Geist consented to this.  I did not receive

evidence to refute the content of the March 8, 1999 phone discussion between Mr. Keown and

Rudolph Geist regarding the Rudolph Geist Loans.[13]  Consideration of the financial distress of

U.S. Netway at that point in time, and its need to promptly conclude the transaction, provides a

---

[13] Rudolph Geist, the primary negotiator for U.S. Netway and its shareholders, is the obvious source of evidence to contradict Mr. McKeown's version of the phone conversation. Rudolph Geist did not testify.

further basis for crediting Mr. Keown's testimony on this point.[14]

In reaching my conclusion, I also am influenced by the January 1999 Letter of Intent. According to Mr. Keown, the January 1999 Letter of Intent provided the basis for how NuNet arrived at its purchase price for U.S. Netway's stock.  The January 1999 Letter of Intent did not list the Rudolph Geist Loans among the liabilities NuNet would assume. I believe that if the parties subsequently intended to include the Rudolph Geist Loans in the Agreement, the parties would have expressly memorialized their new understanding; perhaps through a letter, an email or even an addendum to the January 1999 Letter of Intent.  There is no evidence in the record that such a communication took place.

In summary, what has become abundantly clear to me is that the Agreement was executed in a hasty fashion, perhaps out of necessity.  Mistakes were made and details were overlooked. In reviewing the evidence together on this final component of the Collective Proof of Claim, I find that the Geist Claimants have failed to show by a preponderance of the evidence that the Rudolph Geist Loans was an assumed liability under the Agreement.  Consequently, I sustain the Debtor's objection to this final component of the Collective Proof of Claim.

---

[14] Mr. Keown suggested that this occurred prior to, or contemporaneously with, the execution of the Agreement, although he was not certain because things were happening rather fast at that point.  According to Edward J. Geist, Jr., there was no such agreement because the Rudolph Geist Loans were not crossed off the Balance Sheet when the Agreement was faxed back to U.S. Netway from NuNet.   Apparently, there are as many as eight (8) versions of the Agreement, executed at different times, some of which include the crossed out version of the Balance Sheet.  I find Mr. Keown's version of the story more credible.

# V.    CONCLUSION

For the reasons set forth above, I conclude that the Debtor's objection to the Collective Proof of Claim filed by the Geist Claimants should be sustained in part, and overruled in part.  I am sustaining the Debtor's objection as to the components of the Collective Proof of Claim relating to the outstanding federal tax liability and the Rudolph Geist Loans. I am overruling the Debtor's objection to the component of the Collective Proof of Claim for the Geist Claimants' attorneys fees.  The Geist Claimants are entitled to $95,869.14 in attorneys fees pursuant Paragraphs 7(f) and 10 of the Agreement of Sale executed on March 8,1999.  The Geist Claimants also are entitled to $100,000 for the settlement of D&L Action, as per stipulation of the parties.  Therefore, the Geist Claimants' total allowed claim is $195,869.14.

An appropriate order follows.

Date:    August 29, 2006    _____

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE